IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION

| | |
|---|---|
| ANTHONY T. LEE, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff-Intervenor ) | |
| and Amicus Curiae, ) | |
| ) | CIVIL ACTION NO. |
| NATIONAL EDUCATION ) | 3:70cv847-MHT |
| ASSOCIATION, INC., ) | (WO) |
| ) | |
| Plaintiff-Intervenor, ) | |
| ) | |
| v. ) | |
| ) | |
| RANDOLPH COUNTY BOARD OF ) | |
| EDUCATION, et al., ) | |
| ) | |
| Defendants. ) | |

## OPINION

This is a longstanding school desegregation case
that began in 1963.  The plaintiffs, a class of Black
students, sought and obtained relief from race-based
discrimination in the operation of a *de jure* segregated
school system.  The defendants are the Randolph County
Board of Education, its members, and its

superintendent, as well as the Alabama State Board of Education, its members, the Alabama State Superintendent of Education,[1] and the Governor of Alabama.  On February 26, 2021, the Randolph County Board of Education moved for declaration of unitary status and termination of this litigation.  Based on the evidence presented, the court concludes that the motion should be granted and that this litigation should be terminated as to the Randolph County Board of Education, its members, and its superintendent.

## I. BACKGROUND

### A.  *Early Litigation*

This case began in 1963, when several Black students and their parents sued the Macon County Board of Education and its superintendent seeking relief from the continued operation of a racially segregated school

---

1. By order dated June 20, 1994 (Doc. 9), the court mandated that all orders were to be served on counsel for the Alabama State Department of Education ("ALSDE") and invited counsel for the ALSDE to participate in future proceedings.

system.  On July 3, 1963, the United States was added as plaintiff-intervenor and amicus curiae to ensure that the public interest in the administration of justice would be represented.  *Lee v. Macon Cnty. Bd. of Educ.*, 267 F. Supp. 458, 460 (M.D. Ala. 1967) (per curiam), *aff'd sub nom*, *Wallace v. United States*, 389 U.S. 215 (1967) (per curiam).  The *Lee* litigation, as it is known, grew to involve 35 school districts throughout Alabama; as part of that litigation, the Randolph County Board of Education was ordered to desegregate its schools on March 22, 1967, and June 16, 1970.  A full history of the *Lee* litigation is set forth in detail in *Lee v. Russell County Board of Education*, 2002 WL 360000, at *1 (M.D. Ala. Feb. 25, 2002) (Thompson, J.).

### B.  The 1994 Consent Decree

On December 15, 1994, the court entered a consent decree outlining the steps the Randolph County school district was obligated to take to discharge its

3

desegregation obligations. The 1994 consent decree required the district to achieve a workforce goal of 23 % Black Category 1 employees in four years;[2] review its policies, practices, and procedures regarding student assignment, curriculum, transportation, facilities, library materials, and extra- and co-curricular activities; consult with an education consultant on any necessary changes to its policies, practices, and procedures; create a bi-racial committee to assist with implementing the consent decree's terms and reviewing transportation, facilities, student educational opportunities, and personnel for any racial disparities; create a Personnel Director role to implement all employment policies, practices, and procedures; adopt new personnel policies and practices to govern all aspects of employee selection, transfer,

---

2. Category 1 employees are assistant superintendents, speech therapists, nurses, assistant principals, teachers, itinerant teachers, librarians, itinerant librarians, coaches, counselors, itinerant counselors, the special education coordinator, the federal programs coordinator, and the director of the vocational school.

**4**

demotion, termination, and compensation; remove the
then-principal of Randolph County High School; select a
Discipline Coordinator to monitor and coordinate the
development and implementation of nondiscriminatory
student discipline policies, prepare monthly reports on
disciplinary statistics throughout the district, send a
letter to all parents regarding changes in students
discipline procedures and policies, and train all staff
with student contact on the disciplinary procedures;
ensure each school in the district submitted monthly
discipline reports; form a Bi-Racial Discipline Review
Committee to make recommendations for addressing
discriminatory practices, report whether employees were
following disciplinary practices and procedures, and
meet with community members regarding disciplinary
concerns; initiate a campaign to ensure all
extracurricular activities have a racially diverse
membership; require, for any student-elected
extracurriculars, that the voting panel reflect the
racial diversity of the school; appoint a Curriculum

Counselor to meet with each high school student at least once a year, conduct parent workshops, and present extracurricular opportunities to parents and the community; develop a comprehensive curriculum guidance program to further equal opportunity in pursuing college-preparatory courses; ensure students are placed into special education programs in a race-neutral manner; ensure students and their parents complete "Certificates of Understanding" to indicate whether students intend to pursue an advanced or standard diploma; and submit annual reports to the court that include statistics on employment, student transportation, student discipline, and student assignment.

## C. *Subsequent Consent Orders*

On March 31, 2009, the court entered an order requiring all parties to address what issues remained in the litigation. In a joint status report filed on October 15, 2009, the parties identified two remaining

desegregation issues: (1) personnel hiring and the goal
of having 23 % Black Category 1 employees and (2)
discipline.  On March 31, 2011, the court entered a
consent order modifying the 1994 consent decree to
address these two remaining issues.  The 2011 consent
order required the district to: recruit at Historically
Black Colleges and Universities ("HBCUs"); consult with
other school systems for successful inclusive
recruiting methods; announce all vacancies at the
central office and on the internet; consider applicants
for all vacancies for which the individual is qualified
and keep all applications for consideration for 36
months; establish an Employment Committee comprised of
two district-selected members and one
plaintiffs-selected member to review applications,
select applicants for interviews, and consider
recommendations from the Local School Committee;[3]

---

    3. The Local School Committee interviews candidates
selected by the Employment Committee, develops uniform
interview questions for all interviewees, and provides
hiring recommendations.  Each school in the district
has a Local School Committee, and this committee is

provide training regarding the hiring process; evaluate the impact of discipline disparities on students; work with an equity consultant to review and revise disciplinary records, policies, and procedures; provide training on the new disciplinary policies and on cultural diversity as it relates to classroom management; file an annual report with the court in November of each year containing statistics on student demographics, teacher and staff vacancies and demographics, and disciplinary policies and trainings; and file monthly reports of student disciplinary statistics.

In March 2013, the parties agreed in a telephonic status conference that the school district had met its obligations with regard to student discipline. Shortly thereafter, in 2013, the court entered another consent order memorializing the parties' agreement. The 2013 consent order identified the only remaining

---

comprised of the school's principal, an Employment Committee-selected member, and a member selected by the plaintiffs.

desegregation issues in the case as (1) hiring and the workforce goal for Category 1 employees and (2) the interim employment of Category 1 employees.  That order adjusted the workforce goal to 16 % Black Category 1 employees and required that the district reach the 16 % goal within three years and maintain it for two consecutive years afterward.  The order also approved the parties' proposed procedure for filling unanticipated teacher vacancies[4] on an interim basis.

On May 9, 2016, the court entered the final consent order in this case.  The 2016 consent order required the district to work with a faculty equity consultant to revise its recruitment, hiring, and retention practices, policies, and procedures; submit detailed monthly reports on its work with the consultant; recruit and interview at HBCUs; and send notice of all

---

4. To fill unanticipated vacancies in a certified academic teaching position during the school year or within two weeks of the start of a school year, the district must employ a qualified applicant on an interim basis and for no more than six weeks.  Before employing interim employees, the district must consult the United States Department of Justice.

employment vacancies to education placement officials at public universities and HBCUs in Alabama at least fourteen days before the position's application deadline.

### D.   The 2021 Motion for Declaration of Unitary Status

The school district filed its motion for declaration of unitary status and termination of this litigation on February 26, 2021.  On March 15, the United States filed a response indicating that it had no objection to the district's request for a declaration of unitary status subject to any concerns raised at a fairness hearing.  Private plaintiffs filed a response the same day, noting that they did not have a legal objection to the district's motion, subject to the comments, objections, documents and testimony provided at a fairness hearing.  Private plaintiffs asserted that the district was obligated to prove that it had attained unitary status at that fairness hearing and noted that they reserved the right to present

evidence related to unitary status at such a hearing. After receiving responses from the United States and private plaintiffs, the court scheduled a fairness hearing for May 14, 2021, required publication and notice of the hearing and the proposed termination of federal supervision, and established procedures for community members to file comments and objections in advance of the hearing.

Consistent with the court's requirements, the school district published notice of the fairness hearing and the proposed termination of this litigation on its website, in the local newspaper, at all district schools (and on their websites) and the Central Office, and on the district's Twitter page once a week for three consecutive weeks beginning on April 7, 2021. The district sent every parent or guardian of each district student notice of the hearing by email. The notice included procedures for the public to file comments and objections with the court regarding the proposed dismissal of the lawsuit. The notices also

11

described how members of the public could attend the hearing by either (1) appearing in person at the Randolph County High School on May 14, 2021 or (2) requesting an individual Zoom link to attend the hearing virtually.  From April 6 to May 14, 2021, the district made available on the district's website and at the district's central office copies of all relevant documents--the motion for unitary status and its accompanying memorandum (and supporting documents), the plaintiffs' responses to the motion for unitary status, the 1994 consent decree, 2011 consent order, 2013 consent order, 2016 consent order, annual reports from 2013 to 2020, and monthly reports from March 2019 to March 2021.

The court concludes that the Randolph County Board of Education complied with the court's directives in providing adequate notice of the proposed dismissal to the community.  As a result of the notice provided, community members filed eight written objections to the motion for unitary status with the court.  These

objections expressed concerns about qualified Black applicants not being selected for vacancies; Black teachers not receiving tenure; retaliation against employees for speaking out about perceived disparities in the hiring process; Black community members not feeling represented by the Black employees or representatives the district has engaged in the hiring process; the extent to which the district has been submitting valid data to the court and thus whether the district has actually been complying with the operative desegregation orders; and other actions taken by district administrators.

The court held a fairness hearing on the district's motion for declaration of unitary status on May 14, 2021, as scheduled. In addition to oral testimony and evidence presented by the parties, members of the public had an opportunity to provide and provided public comments at the hearing.

## II. DISCUSSION

### A.   Standards for Termination of a School Desegregation Case

"The goal of a school desegregation case is to convert promptly from a *de jure* segregated school system to a system without 'white' schools or 'black' schools, but just schools." *Lee v. Autauga Cnty. Bd. of Educ.*, 2004 WL 1699068, at *5 (M.D. Ala. July 30, 2004) (Thompson, J.) (citing *Green v. Cnty. Sch. Bd.*, 391 U.S. 430, 442, (1968)).  Once this goal has been attained, control of the school system is returned to the local school board, as "local autonomy of school districts is a vital national tradition." *Freeman v. Pitts*, 503 U.S. 467, 490 (1992) (quoting *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 410 (1977)). "Returning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system." *Id.*

In determining whether a school district operating under an order to dismantle a *de jure* segregated school system should be declared unitary, a court must inquire

**14**

whether the school district has complied in good faith with the desegregation decree, and whether the vestiges of prior *de jure* segregation have been eliminated to the extent practicable. *NAACP, Jacksonville Branch v. Duval Cnty. Sch. Bd.*, 273 F.3d 960, 966 (11th Cir. 2001) (citing *Missouri v. Jenkins*, 515 U.S. 70, 88 (1995), and quoting *Freeman*, 503 U.S. at 492); *see also Manning v. Sch. Bd. of Hillsborough Cnty., Fla.*, 244 F.3d 927, 942 (11th Cir. 2001), *cert. denied*, 534 U.S. 824 (2001); *Lockett v. Bd. of Educ. of Muscogee Cnty.*, 111 F.3d 839, 842–43 (11th Cir. 1997). Courts conducting this inquiry generally examine six areas of a school district's operations: student assignment, facilities, faculty, staff, transportation, and extracurricular activities. *Green*, 391 U.S. at 435.

In addition to meeting the aforementioned constitutional standard, the district must have complied in good faith with the terms of the 2016 consent order and the portions of the 1994 consent decree, 2011 consent order, and 2013 consent order that

survived the 2016 consent order. Accordingly, the district must establish that it followed the specific recruitment, hiring, and retention practices, policies, and procedures outlined in the orders; that it attained a Category 1 certified employee workforce that is at least 16 % Black; that it maintained that percentage of Black Category 1 certified employees for at least two consecutive years; and that it filed detailed monthly and annual compliance reports.

### B. Compliance

#### 1. Student Assignment

##### a.  Between and Within School Student Assignment

To achieve unitary status in the area of student assignment, the district must establish that it assigns students to schools and classes on a nondiscriminatory basis. In addition, the 1994 consent decree required the district to review its policies and procedures with regard to student assignment and file annual reports with the court including relevant data and information.

In the 2020-21 school year, the district enrolled 2,025 students who attended seven schools and a career technology center. 1,524 (75 %) of those students were White; 294 (15 %) of those students were Black. Student enrollment at each district school for the 2020-21 school year was as follows:

| School | Black | White | Other | Total |
|--------|-------|-------|-------|-------|
| Wedowee Elementary School (K-3) | 57 (21 %) | 153 (58 %) | 55 (21 %) | 265 |
| Wedowee Middle School (4-6) | 38 (20 %) | 131 (70 %) | 18 (10 %) | 187 |
| Rock Mills Junior High School (K-8) | 10 (6 %) | 142 (92 %) | 3 (2 %) | 155 |
| Randolph County High School (7-12) | 80 (19 %) | 304 (72 %) | 39 (9 %) | 423 |
| Wadley High School (K-12) | 74 (19 %) | 273 (70 %) | 42 (11 %) | 389 |
| Woodland Elementary School (K-6) | 19 (6 %) | 283 (87 %) | 23 (7 %) | 325 |
| Woodland High School (7-12) | 16 (6 %) | 238 (85 %) | 27 (9 %) | 281 |
| TOTAL | 294 (15 %) | 1,524 (75 %) | 207 (10 %) | 2,025 |

The parties agreed in a 2009 joint status report that the district had met its student assignment-related desegregation obligations. The 2011 consent order memorialized that agreement. Based on the evidence submitted, the district has continued to

17

assign students to its schools and classrooms without regard to race. In particular, the district assigns students to schools based on their places of residence and the attendance zones that correspond with those places of residence. The district limits transfers between schools and other school districts. Within schools, students are assigned and have access to classes--including gifted classes and honors awards--without regard to race. Moreover, the district has not received any complaints of race discrimination in student assignment.

### b. *Student Discipline*

In addition to student assignment between and within schools, the student assignment *Green* factor encompasses student discipline. The 1994 consent decree and the 2011 consent order specifically required the district to address discipline disparities between Black and White students. The 1994 consent decree required each school's Discipline Coordinator to meet

with the school's principal to identify the cause of any disparities in discipline where the percentage of Black students disciplined exceeded the school's percentage of Black student enrollment by more than 10 %.  The 2011 consent order obligated the district to work with an equity consultant to evaluate how discipline disparities affect students, revise its disciplinary policies, and provide additional training to its employees on discipline procedures and cultural diversity.  The district also was required to include discipline data in its monthly compliance reports.

In 2013, after the district met the requirements outlined above, the parties agreed that the district had satisfied its discipline-related desegregation obligations.  The evidence in the record indicates that the district continues to follow the revised discipline policies and train its employees on those policies with the goal of administering discipline without regard to race.

In light of the foregoing, the court concludes that the district assigns students to schools and classes on a nondiscriminatory basis and that the district has complied with the 1994 consent decree and subsequent consent orders in the area of student assignment. Accordingly, the district has attained unitary status with respect to student assignment.

## 2.   Facilities

To attain unitary status in the area of facilities, the district must ensure that its facilities are maintained equitably without regard to race.  In a 2009 joint status report, the parties agreed that the district had met its facilities-related desegregation obligations.  Since 2009, the district has continued to address the needs of its facilities without regard to the race of the students utilizing those facilities.[5]

---

5. Unlike some school districts, Randolph County does not have any racially-isolated Black schools. Black students attending the district's schools are assigned across those schools in a manner relatively consistent with their representation in the

The district undertakes facilities projects based on need and the availability of funding and has not received any complaints of race discrimination in its facilities administration or maintenance. Because there are no distinctions in the quality or funding of the district's facilities based on race, the court finds that the district is unitary with regard to this *Green* factor.


### 3. Faculty and Staff Assignment

To meet its desegregation obligations in the area of faculty and staff, a school district must "develop policies and procedures to ensure that faculty and staff [a]re assigned to schools across the district so that no school would be identified as a white or black school by the race of the school's faculty." *Lee v. Butler Cnty. Bd. of Educ.*, 183 F. Supp. 2d 1359, 1365 (M.D. Ala. 2002) (Thompson, J.) (citing *Singleton v.*

---

district-wide student population. Accordingly, to the extent there are any differences in the district's school facilities, those differences are not attributable to race.

*Jackson Mun. Separate Sch. Dist.*, 419 F.2d 1211, 1218 (5th Cir. 1969), *rev'd on other grounds*, 396 U.S. 290 (1970)).   In this case, the district's Category 1 faculty and staff are assigned to schools across the district such that the proportion of Black Category 1 faculty and staff at each school is substantially the same as the proportion of Black Category 1 faculty and staff district-wide.   No school is identifiable as a White or Black school by the race of that school's faculty and staff.   The assignments for the last three school years, which support this conclusion, are as follows:

2018–19

| School | Black | White | Total |
|---|---|---|---|
| Central Office | 2 (20 %) | 8 (80 %) | 10 |
| Randolph-Roanoke Career Technology Center | 1 (11 %) | 8 (89 %) | 9 |
| Randolph County High School | 6 (21 %) | 23 (79 %) | 29 |
| Rock Mills Junior High School | 4 (22 %) | 14 (78 %) | 18 |
| Wadley High School | 2 (6 %) | 29 (94 %) | 31 |
| Wedowee Elementary School | 5 (20 %) | 20 (80 %) | 25 |
| Wedowee Middle School | 3 (20 %) | 12 (80 %) | 15 |
| Woodland High School | 3 (14 %) | 19 (86 %) | 22 |
| Woodland Elementary School | 3 (13 %) | 21 (87 %) | 24 |
| TOTAL | 29 (16 %) | 154 (84 %) | 183 |

2019–20

| School | Black | White | Total |
|---|---|---|---|
| Central Office | 3 (30 %) | 7 (70 %) | 10 |
| Randolph-Roanoke Career Technology Center | 1 (11 %) | 8 (89 %) | 9 |
| Randolph County High School | 7 (24 %) | 22 (76 %) | 29 |
| Rock Mills Junior High School | 4 (22 %) | 14 (78 %) | 18 |
| Wadley High School | 3 (10 %) | 28 (90 %) | 31 |
| Wedowee Elementary School | 4 (15 %) | 22 (85 %) | 26 |
| Wedowee Middle School | 3 (21 %) | 11 (79 %) | 14 |
| Woodland High School | 3 (13 %) | 20 (87 %) | 23 |
| Woodland Elementary School | 3 (13 %) | 20 (87 %) | 23 |
| TOTAL | 31 (17 %) | 152 (83 %) | 183 |

23

2020-21

| School | Black | White | Total |
|---|---|---|---|
| Central Office | 3<br>(30 %) | 7<br>(70 %) | 10 |
| Randolph-Roanoke Career Technology Center | 2<br>(20 %) | 8<br>(80 %) | 10 |
| Randolph County High School | 6<br>(21 %) | 22<br>(79 %) | 28 |
| Rock Mills Junior High School | 4<br>(24 %) | 13<br>(76 %) | 17 |
| Wadley High School | 3<br>(10 %) | 28<br>(90 %) | 31 |
| Wedowee Elementary School | 7<br>(24 %) | 22<br>(76 %) | 29 |
| Wedowee Middle School | 1<br>(8 %) | 12<br>(92 %) | 13 |
| Woodland High School | 2<br>(11 %) | 17<br>(89 %) | 19 |
| Woodland Elementary School | 3<br>(14 %) | 19<br>(86 %) | 22 |
| TOTAL | 31<br>(17 %) | 148<br>(83 %) | 179 |

*See* Exhibit to Annual Report for 2018 (Doc. 459-1); Exhibit to Annual Report for 2019 (Doc. 482-1); Exhibit to Annual Report for 2020 (Doc. 500-1).

In addition to its obligation to ensure that the assignment of faculty and staff does not identify a school as a Black school or a White school, the district was obligated to take additional action in the area of faculty and staff under the terms of the operative desegregation orders. Specifically, the district was required to (1) reach 16 % Black Category

1 employees and maintain that percentage for two consecutive years, (2) follow certain procedures for recruitment and hiring, (3) retain and work with a faculty consultant expert, and (4) follow certain procedures for the interim employment of teachers.

In accordance with the 2016 consent order requirements, the district has recruited on-campus at HBCUs, sent notices of employment vacancies to public universities and HBCUs in Alabama, and submitted the required compliance reports to the court, including all of the necessary information and descriptions regarding its recruitment efforts.   It has also retained a faculty equity consultant to assist it with recruiting, hiring, and retaining Black faculty members by revising its hiring policies and practices. The district continued to consult with the faculty consultant on a regular basis after completing the revised hiring policies and practices to further improve its recruitment and retention of Black employees.   The district's monthly compliance reports to the court

25

describe these consultations and the progress the district made as a result of the consultations.

The district has continued to follow its revised hiring policies, including those governing interim employment of teachers, and has also submitted the required annual compliance reports to the court reporting information regarding employment, recruitment, and retention of employees by race. The district's efforts in this respect have produced results. In 1994, only 10 % of the district's teachers were Black, and all of the counselors, teacher aides, assistant principals, principals, and assistant superintendents were White. By the time of its November 2017 annual compliance report, the district reported 15 % Black Category 1 faculty. In 2018, 2019, and 2020, the district reported 15.85 %, 16.94 %, and 17.12 % Black Category 1 faculty, respectively. In light of this evidence, the district has complied with the Black Category 1 workforce goal set forth in the 2016 consent order.

Given the district's attainment of its Category 1 workforce goals and its compliance with all other constitutional and contractual desegregation obligations, the district is entitled to a declaration of unitary status as to faculty and staff.

### 4. Transportation

To establish its entitlement to a declaration of unitary status in the area of transportation, the district must establish that it "provide[s] transportation in a non-discriminatory fashion." *NAACP v. Duval Cnty. Sch.*, 273 F.3d 960, 967 (11th Cir. 2001). The district may not use "race as a basis for assigning students to school buses" or implement "overlapping and duplicative bus routes based on race." *Lee v. Lee Cnty. Bd. of Educ.*, 963 F. Supp. 1122, 1126 (M.D. Ala. 1997) (Thompson, J.); *see also Lee v. Macon Cnty. Bd. of Educ.*, 267 F. Supp. at 481. Consistent with these standards, the 1994 consent decree requires the district to implement policies to ensure that buses

operate on a fully desegregated basis and that transportation burdens are shared equally among Black and White students.

In 2009, the parties reported to the court that the district's compliance with its transportation-related desegregation obligations was no longer an issue in this case. Consistent with the parties' reporting, the district has established that it offers transportation to students enrolled in the district without regard to race. At the time of their enrollment, students provide the district with their home addresses. Student transportation, including any assignment to a particular bus route, is based on the home address that a student provides. When generating bus routes and assigning students to those routes, the district is guided by a computer program that generates routes based on students' places of residence and efficiency.[6] Race is not a factor in this process. The district has

_____

6. The State of Alabama evaluates the district's bus routes every four years. The State last conducted such an evaluation in 2019 and found no deficiencies in the safety or efficiency of the district's routes.

not received any complaints from parents, students or otherwise alleging race discrimination in transportation. The district has therefore met the burden required for a declaration of unitary status in the area of transportation.

### 5. Extra-Curricular Activities

The 1994 consent decree required that the district "implement uniform policies and procedures to ensure that all students, regardless of race, have equal opportunities to take advantage of all extra- and co-curricular offerings." Consent Decree (Doc. 89) at 31. In the 2009 joint status report, the parties agreed that the district's compliance with its desegregation obligations in the area of extracurricular activities was no longer an issue in this case. Since that time, the district has continued to follow its nondiscriminatory policies for extracurricular activities. The court concludes that the district has satisfied its obligations in the area

of extra-curricular activities.   The district maintains
and follows nondiscriminatory policies for
extra-curricular activities.    There are no racial
distinctions or race-based criteria for participating
in any of the district's extracurricular activities.
To participate in extracurricular activities, students
need only meet the relevant grade, attendance,
behavior, and/or physical examination requirements.
These requirements apply equally to all students,
regardless of race.   For these reasons, the district
has attained unitary status in the area of
extra-curricular activities.

### C.  *May 14, 2021, Fairness Hearing*

As previously noted, after the Randolph County
Board of Education filed its motion for declaration of
unitary status and termination of this litigation, the
court scheduled a fairness hearing, required
publication and notice of the hearing and the proposed
dismissal of this case, and established procedures for
community members to file comments and objections.

Eight objections were filed with the court opposing termination of the case. All eight objections expressed concerns regarding the district's employment practices, including the asserted failure to post vacant positions, appropriately compose hiring committees, and hire and tenure qualified Black faculty and staff (including for higher-level positions). The objections also complained of preferential hiring of uncertified White candidates, and several expressed worries about retaliation and the district returning to past discriminatory practices should court supervision end.

The district filed a response to the eight objections stating that it currently employs two Black principals (both of whom were hired after 2017), two Black Central Office employees, and 21 tenured Black Category 1 employees. The district noted that since 2015, only six Black Category 1 employees have been nonrenewed, preventing those employees from achieving tenure. It also noted that it has followed the

operative consent orders in every aspect, including recruiting Black college students, working with equity consultants, and revising and implementing new hiring policies and procedures. The district confirmed that the members of the Employment Committee and the Local School Committee are selected pursuant to the requirements of the operative consent orders. The district also confirmed that it has complied with the requirements governing the posting of vacant positions and has hired Black teachers without certification and worked with them to obtain certification.

At the fairness hearing, the court heard testimony offered by the Randolph County Board of Education. Four witnesses testified on behalf of the district and were cross-examined by counsel for private plaintiffs and the United States. The testimony of the witnesses confirmed the information outlined above, as well as the information contained in the annual report filed by the Randolph County Board of Education on November 2, 2020.

32

Superintendent John Jacobs indicated that he has been superintendent since January 2017 and has been associated with the district as an employee or member of its board of education for over three decades. His testimony addressed the areas of student assignment and facilities. He also discussed the resolution that the board passed after consulting with the biracial Superintendent's Advisory Committee. In that resolution, the board commits to maintaining a unitary school system by continuing to implement nondiscriminatory policies and by avoiding any official action that has the effect of perpetuating or re-establishing a school system that is or appears to make distinctions based on race. Superintendent Jacobs described the district's grievance process, which will allow the community to raise any future concerns, and attested that there are no plans to change any of the district's hiring practices or policies--including use of the Employment Committee and Local School Committee, recruitment at HBCUs, and retention bonuses--if unitary

status is obtained. He also addressed a specific written objection regarding the recent employment of a White applicant for the position of child nutrition program director, clarifying that the applicant hired was the only one who applied for the position.

On cross examination, Superintendent Jacobs testified that there were three instances where teachers or administrators in the school system made complaints of racial discrimination in the area of employment. The complaints were made either internally, with the Equal Employment Opportunity Commission, or by lawsuit. All claims of employment discrimination were resolved either by dismissal or settlement. He also testified that the district dismissed a high school principal in 2018 for showing a racially insensitive film at a faculty meeting that included a Black assistant principal and Black teachers. The action of the principal resulted in verbal complaints from nearly every employee at the school, including all the Black teachers at the school.

34

Mary Kelly, who has been the district's Human Resources Coordinator since 2017, testified that she has held various positions within Randolph County Schools over the course of the last 30 years, including teacher, counselor, and principal.  She described in detail the district's hiring procedures, including the process for posting vacancies and the roles that the Employment Committee and Local School Committees play in the selection process.  Ms. Kelly testified that since August of 2017, the district has operated a mentoring program for all new hires and has assigned primary and secondary mentors.  Black teachers are assigned mentors through their tenure year to promote retention.  The district has identified fully-certified Black teachers as a "high-need" area, thereby allowing the district to award Black teachers incentive and return bonuses.  Ms. Kelly indicated that the district plans to continue its Grow Your Own program and the mentorship program even if granted unitary status.  Addressing the district's tenuring of employees, Ms.

Kelly noted that 68 percent of the district's Black employees are currently tenured and that the district has tenured 11 Black employees since 2017. Of the current Black employees not tenured, two are working to attain the required professional certificate, one is in a contract position not eligible for tenure, and the remainder have not yet attained tenure because they were hired in the last three years. Finally, Ms. Kelly addressed an objector's allegation that a Black applicant was wrongly passed over for a reading specialist position at Wedowee Elementary School. She testified that the White candidate selected for the position had attained a higher level of education in the relevant field than the Black applicant allegedly passed over.

Principal of Randolph County High School Clifton Drummonds testified about the district's Code of Conduct and the manner in which student discipline is administered. He also explained his roles on the Employment Committee, in recruiting Black employees

through on-campus visits to colleges and universities, and as the district's minority liaison.

District witness Lucille Burns was employed by the district for 41 years and served as a teacher, assistant principal, principal, and curriculum coordinator before retiring. She also served on the Employment Committee and a Local School Committee. In 2013, her service on the Employment Committee was as a member appointed by plaintiffs. Ms. Burns currently works on contract to staff the district's parent hotline for general issues. She has been a mentor for Black teachers for the last two years and still serves on the Employment Committee as a member appointed by the district. In the course of her testimony, she explained her role as curriculum coordinator from 1994-2013 under the operative desegregation orders, her role in student assignment when she was principal at Wedowee Elementary, and her assistance in the district's efforts to address disparities in student discipline.

Two community members made statements at the fairness hearing objecting to dismissal of the case. The first objector, who also filed a written objection in advance of the hearing, spoke for the local chapter of the NAACP (Branch 5053). He acknowledged that Randolph County has met the minimum requirements of the consent orders but said that Branch 5053 does not support a grant of unitary status because of the system's history of discrimination. He further stated that Branch 5053 believes that if the district is granted unitary status and no longer required to report to the court, it will return to its previous discriminatory practices. Superintendent Jacobs responded to these objections at the hearing by noting that he had recently spoken to representatives from the local chapter of the NAACP. He reiterated his and the board's commitment to keep the district free of discriminatory practices. He also expressed a willingness to continue to meet with the NAACP moving forward.

The second objector, a former employee of the district, expressed concerns that minority employees within the district are afraid to speak out because of retaliation. She noted that she could not speak about her own claim against the district, which had been settled, but stated that she knew at least two other district employees who had filed claims against the district with the Equal Employment Opportunity Commission. She also indicated that she had spoken to some minority employees and none had received the bonus incentives referenced in earlier testimony. The second objector repeated the concern raised in a written objection[7] that although Lucille Burns does not represent the Black community, she is still the liaison purporting to represent the community. She also alleged that relatives of Ms. Burns have received preferences in hiring and that the district engages in colorism when selecting the Black employees or

---

7. The written objection included letters from 2013 complaining that Ms. Burns had been appointed as a temporary replacement for the plaintiffs' representative on the Employment Committee.

representatives who participate in its employment selection process by favoring those with lighter-toned skin.

In his response to the comments made by the second objector, Superintendent Jacobs denied that nepotism is an issue in hiring but noted that, in a small school system such as Randolph County, some employees are related to one another. He also explained that the bonuses for Black teachers were only for those hired in or after 2017 and attested that there are no lawsuits charging race discrimination currently pending against the school system. Plaintiffs' attorney Mr. Gray clarified that Ms. Burns is not currently a representative of the minority community, but rather is a community liaison for the school board.

### III. CONCLUSION

On the basis of the record evidence, witness testimony, and averments of counsel, the court finds that the Randolph County Board of Education and its

40

members and superintendent have met the standards entitling the school district to a declaration of unitary status and termination of this litigation. The board has fully and satisfactorily complied with the orders of the court. The vestiges of the prior *de jure* segregated school system have been eliminated to the extent practicable. The court also finds that the board and its members and superintendent have demonstrated a good-faith commitment to the whole of the court's decrees and to those provisions of the law and the Constitution that were the predicate for judicial intervention in this school system in the first instance through their compliance with the court's orders over the years, through their good-faith implementation of their contractual obligations under the 1994 consent decree, 2011 consent order, 2013 consent order, and 2016 consent order, and through their adoption of specific policies and actions that extend into the future demonstrating their commitment

to the operation of a school system in compliance with the Constitution.

While the court acknowledges and takes seriously the concerns expressed by the community members who filed written objections with the court and those who made verbal objections on the record during the fairness hearing, the court finds that unitary status is still warranted.  The community speakers have made serious charges of employment discrimination by the district--charges that may very well have merit.  The court does not pass on their merit today.  Rather, the important question is whether the Randolph County School System has reached the critical point where claims of race discrimination can be adequately addressed through traditional federal remedies, such as Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 1981a, 2000e through 2000e–17, and the Civil Rights Act of 1866, 42 U.S.C. § 1981, and court oversight is no longer warranted.  The current record

suggests that the system, albeit perhaps an imperfect one, has reached that point.

More generally, to the extent that community members expressed broader concerns about the prospect of the district reverting to past discriminatory practices in the absence of continued court supervision, the court notes that it cannot maintain federal supervision in the absence of evidence of continuing discrimination simply to guard against the *possibility* of discriminatory practice in the future. As the Eleventh Circuit stated in *Duval County Schools*, "The Board, and the people of [Randolph County] who, in the end, govern their school system, must be aware that the door through which they leave the courthouse is not locked behind them.  They will undoubtedly find that this is so if they fail to maintain the unitary system [the court] conclude[s] exists today." *NAACP Jacksonville Branch v. Duval County Schools*, 273 F.3d 960, 976-77 (11th Cir. 2001).

In sum, the plaintiff parties have succeeded in the

**43**

task they began decades ago when seeking the end of the seemingly immovable *de jure* system of school segregation in Randolph County. This lawsuit sought to bring the district into compliance with the constitutional requirement of equal protection under the law, and the court states today that they have succeeded. *See id.* at 976. By its actions today, the court recognizes and congratulates the sustained efforts of the parties. With the judgment the court will enter today, control over the Randolph County School System is properly returned to the Randolph County Board of Education and its members and superintendent. The motion for declaration of unitary status and termination of this litigation filed by the board and its members and superintendent will be granted, all outstanding orders and injunctions will be dissolved, and this litigation dismissed as to the board and its members and superintendent.

DONE, this the 22nd day of June, 2021.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE